IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANTHONY S. GALUTZA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 05-CV-058-GKF-PJC |
| HARTFORD LIFE AND ACCIDENT ) | |
| INSURANCE CO., ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Anthony Galutza ("Galutza") seeks relief under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1101 *et seq.* ("ERISA") from a denial of long term disability benefits by defendant Hartford Life and Accident Insurance Co. ("Hartford"). Galutza contends Hartford wrongfully terminated long term disability benefits in violation of 29 U.S.C. §1132(a)(1)(B).[1]

### I. Standard of Review

Hartford had discretion under the plan to determine whether Galutza qualified for benefits. Therefore, the court's review is limited to determining if the decision was arbitrary or capricious. *Chambers v. Family Health Plan Corporation,* 100 F.3d 818, 825 (10th Cir. 1996); *Sandoval v. Aetna Life and Casualty Insurance Co.,* 967 F.2d 377, 380 (10th Cir. 1992). Under this standard, '[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was

---

[1] Alternatively, Galutza asserts a claim for breach of fiduciary duty in violation of 29 U.S.C. §1132(a)(3). The court previously ruled Galutza's §1132(a)(1)(B) claim for wrongful termination of his long term disability benefits must be decided before his alternative claim for breach of fiduciary duty can be addressed. [Doc. No. 45].

arbitrary or capricious." *Kimber v. Thiokol Corporation,* 196 F.3d 1092, 1098 (10th Cir. 1999), quoting *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1460 (10th Cir. 1991). The decision will be upheld unless it is not grounded on *any* reasonable basis. *Id.* The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness–even if on the low end." *Id.*

However, where–as here–the insurer both issued the benefit plan and had fiduciary discretionary authority to determine eligibility, it operated under an inherent conflict of interest while determining the insured's eligibility; therefore, the standard set out in *Fought v. UNUM Life Ins. Co. Of America,* 379 F.3d 997, 1006 (10th Cir. 2004) applies to the judicial review of the insurer's denial of plaintiff's application for long term disability benefits. Thus, the administrator "bears the burden of proving the reasonableness of its decision pursuant to the Tenth Circuit's traditional arbitrary and capricious standard." *Fought* at 1006. The administrator must demonstrate that its interpretation of the terms of the plan is reasonable and its application of those terms to the claimant is supported by substantial evidence. *Id.* "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992). Substantial evidence requires "more than a scintilla but less than a preponderance" of evidence. *Id.* This standard allows a "flex" of the traditional "arbitrary and capricious" standard to allow a reviewing court to adjust for the circumstances alleged, such as trustee bias in favor of a third party or self-dealing by the trustee. *Fought* at 1006. Thus, the court considers defendant's conflict of interest as one factor in determining whether defendant's denial of disability benefits to plaintiff was arbitrary and capricious. *Id.* at 1005.

In determining whether a plan administrator's decision was arbitrary and capricious, the district court must make its decision based upon the arguments and evidence before the plan administrator at the time the administrator made its decision to deny benefits. *Sandoval,* 967 F.3d at 381.

## II. Statement of Facts

1. Hartford issued a Group Long Term Disability Plan for employees of FedEx. [Doc. No. 19, Administrative Record ("AR"), Policy, Hart-Galutza ("HG") 0001]. FedEx is the Plan Administrator. [*Id.*, HG 0039]. Hartford, however, has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. [*Id.,* HG 0028].

2. Under the terms of the Policy, a participant may qualify for total disability benefits as follows:

> You will be paid a monthly benefit if:
>
> 1. You become Disabled while insured under this plan;
> 2. You are Disabled throughout the Elimination Period;
> 3. You remain Disabled beyond the Elimination Period;
> 4. You are, and have been during the Elimination Period, under the Regular Care of a Physician; and
> 5. You submit Proof of Loss satisfactory to us.

[Doc. No. 19, Administrative Record ("AR"), Hart-Galutza ("HG") 0018].

3. The Policy defines "Disability or Disabled" as follows:

> **Disability or Disabled** means that during the Elimination Period and for the next 12 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness
> 4. Substance Abuse; or

     5.     pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

[*Id.,* HG 0029].

     4. The Policy provides, in pertinent part, that benefits may be terminated as follows:

We will terminate benefit payment on the first to occur of:

1.     the date you are no longer Disabled as defined;
2.     the date you fail to furnish Proof of Loss, when requested by us;
3.     the date you are no longer under the Regular Care of a Physician, or refuse our request that you submit to an examination by a Physician;

                \*   \*   \*

9.     the date you refuse to receive recommended treatment that is generally acknowledged by physicians to cure, correct or limit the disabling condition.

[*Id.,* HG 0019].

     5. "Proof of Loss" is defined as follows:

Proof of Loss may include but is not limited to the following:

1.     documentation of:
        a)    the date your Disability began;
        b)    the cause of your Disability;
        c)    the prognosis of your Disability;
        d)    your Earnings or income, including but not limited to copies of your filed and signed federal and state tax returns; and
        e)    evidence that you are under the Regular Care of a Physician;

2.     any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;

3.     the names and addresses of all:
        a)    Physicians and practitioners of healing arts you have seen or consulted;
        b)    hospitals or other medical facilities in which you have been seen or treated; and
        c)    pharmacies which have filled your prescriptions in the last three years;

    4.      your signed authorization for us to obtain and release:
            a)    medical, employment and financial information; and
            b)    any other information we may reasonably require. ...

[*Id.,* HG 0026].

    6. The Policy sets forth the procedure for appeal of a claim denial, as follows:

On any wholly or partially denied claim, you or your representative may appeal to us for a full and fair review. You may:

    1.      request a review upon written application within 180 days of the claim denial;
    2.      request, free of charge, copies of all documents, records and other information relevant to your claim; and
    3.      submit written comments, documents, records and other information relating to your claim.

The Insurance Company will make a decision no more than 45 days after we receive your appeal. The time for decision may be extended for one additional 45 day period provided that, prior to the extension, the Insurance Company notifies you in writing that an extension is necessary due to special circumstances, identifies those circumstances, and gives the date by which it expects to render its decision.

[*Id.,* HG 0042].

    7. Galutza began working as a Road Driver for FedEx Freight East, Inc. ("FedEx") in 1997. [*Id.,* HG 0254]. His job involved operation of tractor-trailer combinations. [*Id.,* HG0055]. He became insured under the long term disability plan on October 1, 2001. [*Id.,* HG0254].

    8. As a result of an on-the-job injury, Galutza sought medical treatment for back pain in October 2002. [*Id.,* HG 0257]. He stopped working at FedEx October 29, 200l, due to back pain. [*Id.,* HG 0055]. Galutza underwent a C-4-5 anterior discectomy and fusion in November of 2002. [*Id.,* HG 0314-15]. In January 2003, he had a C-6-7 anterior discectomy. [*Id.,* HG 0220]. He submitted a long term disability claim on June 6, 2003. [*Id.,* HG 0253].

    9. Following receipt of Galutza's claim, Hartford solicited information from his treating

physicians and Heidi Stith, FedEx's worker's compensation coordinator. [*Id.,* HG 0247, 0249, 0252].

10.  By letter dated June 16, 2003, Hartford notified Galutza his application for long term disability benefits had been approved effective April 28, 2003. [*Id.,* HG 0194-95].

11.  Hartford continued to monitor Galutza's claim.  In January 2004, it received additional medical records from Galutza's treating physician, Dr. Eric W. Sherburn, indicating that when the physician saw Galutza on November 25, 2003, Galutza's primary complaint was of pain and weakness in his left arm and persistent low back pain. [*Id.,* HG 0163-66].  He recommended an MRI scan of the lumbosacral spine, stated the patient "will probably require an anterior cervical discectomy and fusion at the intervening C5-6 disk" but recommended a cervical discogram be performed beforehand to insure this was where Galutza's pain was coming from. [*Id.,* HG 0165].

12.  On December 18, 2003, Dr. Sherburn wrote a letter to James C. Ferguson, counsel for FedEx on Galutza's worker's compensation claim. [*Id.,* HG 0161-62].  In the letter, Dr. Sherburn stated he had reviewed surveillance videotapes of Galutza provided to him by Ferguson. [*Id.,* HG 0161].  He stated:

> After reviewing these video tapes over several days and viewing Mr. Galutza's activities, I feel as though he has magnified his symptomology and do not feel that even despite the pathology he has in his spine, given the activities that he is able to do, that his case warrants surgery.  In addition, I do not feel that if he is able to do these activities in the manner in which it's portrayed on the videotapes, that he is in need of narcotic pain medications.  I feel as though I have been misled by this patient as to the severity of his symptoms and would request that I not be involved in his care in the future.
>
> In addition, the patient has been on temporary total disability at least since the time these videos have shot.  I do not feel that his is qualified to be temporarily totally disabled nor do I think he is currently temporarily totally disabled.  If

>    you have any questions or concerns regarding this matter, please do not hesitate
>    to contact me.

[*Id.*].

13. On January 5, 2004, Heidi Stith of FedEx forwarded to Hartford "copies of recent medical reports our office has received" regarding Galutza and advised that weekly worker's compensation benefits had ceased effective December 18, 2003, based upon Dr. Sherburn's report of the same date. [*Id.,* HG 0160].

14. By letter dated February 2, 2004, Hartford notified Galutza it was terminating his long term disability benefits effective February 1, 2004. [*Id.,* HG 0115-18]. Hartford stated that it had determined, based on a review of his claim, that Galutza did not meet the policy definition of Disability. [*Id.,* HG 0115]. It stated it had reviewed all of the medical information in his file to decide if he continued to meet the definition of Disability. [*Id.,* HG 0116]. In particular, Hartford referenced Dr. Sherburn's December 18, 2003, letter to Ferguson, in which he stated, "I do not feel that [Galutza] is qualified to be temporarily totally disabled nor do I think he is currently temporarily totally disabled." [*Id.,* HG 0117]. The letter advised Galutza he had the right under ERISA to appeal Hartford's decision and receive a full and fair review. It stated:

>    You may appeal our decision even if you do not have new information to send us.
>    You are entitled to receive, upon request and free of charge, reasonable access to,
>    and copies of, all documents, records and other information relevant to your
>    claim. If you do not agree with our denial, in whole or in part, and you wish to
>    appeal our decision, you or your authorized representative must write to us within
>    one hundred eighty (180) days from your receipt of this letter. Your appeal letter
>    should be signed, dated and clearly state your position. Along with your appeal
>    letter, you may submit written comments, documents, records and other
>    information related to your claim.
>
>    Once we receive your appeal, we will again review your entire claim, including
>    any information previously submitted and any additional information received
>    with your appeal. Upon completion of this review, we will advise your of our

> determination. After your appeal, and if we again deny your claim, you then
> have the right to bring a civil action under Section 502(a) of ERISA.

[*Id.*].

      15. Hartford received an appeal letter from Galutza postmarked February 12, 2004. [*Id.,* HG 0127- 0154]. The date of receipt by Hartford appears to have been February 20, 2004. [*Id.,* HG 0128]. Galutza attached medical records from Dr. Sherburn, letters from Galutza to his attorney, and records concerning his recent visit to the Tulsa Spine Hospital, including the results of a myelogram. [*Id.*]. Galutza explained:

> As to the video tapes that Dr. Sherburn viewed, I was able to do these things
> that were on the videos, but I was on two pain pills every four hours and muscles
> [*sic*] relaxers every six, even on these pain meds, it was physically demanding
> and I had to push myself to be able to do these things, and I suffered from these
> activities for the next couple of days, as per-noted in Dr. Marouks Follow-up
> evaluation Aug. 25, and Oct. 20 2003. At the time the videos were filmed, I had
> been released fom Dr. Marouk to increase all activities pain permitting. And
> Dr Marouk told me that he would be returning me to work very soon. I increased
> all activities in the hope to get my body back into the physical condition
> that it would need to be in to be able to return to work. ...

[*Id.*, HG 0128].

Galutza also enclosed a self-authored "History" of his medical treatment. [*Id.*, HG 0145-47]. Both the appeal letter and the History noted that Galutza's workers compensation attorney planned to depose Dr. Sherburn about the opinions he expressed in the December 18, 2003, letter. [*Id.,* HG 0128, 0147]. The History stated that the deposition was set for February 27. [*Id.,* HG 0147].[2]

      16. Under the Policy, Hartford had 45 days after receipt of the appeal to make a decision.

---

[2] Dr. Sherburn's deposition was not actually taken until April 23, 2004. Portions of the deposition transcript are attached as Exhibit A to Galutza's Opening Brief on His ERISA Claim. [Doc. 54-2]. The deposition transcript is not, however, part of the Administrative Record.

[*Id.,* HG 0042]. The time for the decision could be extended for one additional 45-day period provided Hartford provided written notice to Galutza in advance that an extension was necessary. [*Id.*]. Additionally, the policy permitted Hartford to toll the time for decision of Galutza's claim had to be extended due to his failure to submit information necessary to decide his claim on appeal. [*Id.*]

17. On March 11, 2004, a Hartford appeals specialist reviewed Galutza's appeal and entered notes in Hartford's Benefit Management Services Summary Detail Report. [*Id.,* HG 0048-49]. The notes summarize Galutza's contentions about his medical condition and his explanation of the activities depicted in the videotapes, but do not mention that Dr. Sherburn had been scheduled to be deposed about his changed opinion on Galutza's disability status. [*Id.*]

18. On March 19, 2004, the Hartford appeals specialist recommended in notes recorded in the Summary Detail Report that the decision to terminate Galutza's disability benefits be upheld. [*Id.,* HG 0048]. The notes do not mention the anticipated deposition of Dr. Sherburn. [*Id.*]

19. Subsequently, on March 22, 2004, Hartford received a letter from Galutza postmarked March 13, 2003, attaching medical records from Dr. Bhakta at the Pain and Sports Center, P.L.L.C. [*Id.,* HG 0119-22]. The office visit notes Galutza continued to complain of pain in the neck and low back, left arm and left leg. [*Id.,* HG 0119]. However, Dr. Bhakta did not list any restrictions or limitations. [*Id.,* HG 0119-22].

20. On March 26, 2004, Hartford denied Galutza's appeal, stating:

> Considering your attending physician is not certifying disability and the additional information still does not provide certification of your disability beyond 2/1/04, it is concluded that from review of the additional information contained in your appeal and review of the information previously received, there is no medical medical evidence to refute our original decision. Therefore, it is still our determination that no further benefits are payable under the terms of the policy.

9

This is our final decision and the file remains closed.

[*Id.,* HG 0113-14].

21. Subsequent to the appeal denial, by letter postmarked April 14, 2004, Galutza sent Hartford a letter from Bhadresh L. Bhakta, M.D., at the Pain and Sports Center, concerning his treatment of Galutza [*Id.,* HG 0105-09]; and by letter postmarked April 21, he sent Hartford a copy of a letter from Dr. Sherburn to Galutza's workers compensation attorney, in which he stated:

> Because Mr. Galutza has undergone two anterior cervical discectomies and fusions, and has a degenerated and herniated intervening disk, I do feel that he will need ongoing pain management and should be referred to Dr. Bhakta for ongoing pain management. At some point in the future pending legal events, I will be seeing Mr. Galutza again to discuss the possibility of surgery in the future.

[*Id.,* HG 0111]. Hartford acknowledged receipt of Galutza's letters, but stated that its position had not changed. [*Id.,* HG 0104].

22. By letter postmarked June 9, 2004, Galutza sent Hartford an order from the Oklahoma Workers' Compensation Court awarding him temporary total disability, and advised that he was undergoing testing and awaiting a third surgery from Dr. Sherburn, who was again his treating physician. [*Id.,* HG 0100-03]. Hartford acknowledged receipt of the correspondence but referred back to its March 26, 2004, appeal decision and stated:

> Hartford's final appeal decision was made on 3/26/04. That decision was based on a complete and final administrative record. Therefore, the administrative remedies provided by ERISA and the plan have been exhausted. There are no provisions for additional appeals or re-opening the administrative record after a final appeal determination.

[*Id.,* HG 0097].

23. By letter postmarked October 1, 2004, Galutza sent Hartford a copy of office notes of

Dr. Sherburn dated September 9, 2004, and requested that his long term disability be reinstated. [*Id.,* HG 0090-93]. Dr. Sherburn, in his notes, states Galutza will "definitely need surgical intervention," and further:

> The patient and his wife inform me that he has been cut off from his workers' compensation reimbursement as well as his long-term disability which he was previously getting based upon a letter that I had written after reviewing his video surveillance tapes. As came out in deposition, I realized that Mr. Galutza was not performing anything out of restrictions set forth by his prior physician and the fact that he had not taken any pain medication the day he came to see me is why I felt that his pain mannerisms were significantly different. After discussing the situation and the deposition with Mr. Galutza, I have agreed to take on Mr. Galutza's case. *I do feel that he has been totally disabled since his initial surgery and should continue to receive long-term disability benefits* and since this is secondary to a work-related injury, he should be compensated from workers' compensation in my opinion.

[*Id.,* HG 0091-92] (emphasis added).

24. By letter dated October 8, 2004, Hartford acknowledged receipt of Galutza's correspondence but reiterated that its March 26, 2004, decision was final. [*Id.,* HG 0087].

### III. Analysis

Galutza asserts Hartford's decision to terminate disability benefits was arbitrary and capricious because: (1) it failed to gather and examine relevant evidence in Galutza's appeal of the denial of benefits; and (2) its notice of denial of benefits and appeal rights was inadequate and therefore deprived Galutza of a "full and fair review" in contravention of 29 U.S.C. §1133(1) and (2) and 29 C.F.R. §2560.503-1(g)(i), (iii) and (iv).

#### A. Hartford's Gathering and Examination of Evidence in Appeal

Citing *Gaither v. Aetna Life Insurance Co.,* 388 F.3d 792 (10th Cir. 2004), Galutza contends Hartford violated its fiduciary duty to him by ignoring information in the record, and "rushed to judgment" on his appeal in order to avoid considering evidence that might have

11

supported reinstatement of long term disability benefits.

In that case, Gaither, a long term disability plan participant suffering from multiple myeloma, was suspended from employment because his employer, Monsanto, determined that his use of narcotic painkillers to manage pain from the disease made him unable to perform his job as a utility team leader. *Id.* at 794. Aetna, the plan administrator–apparently unaware that he was suffering from a narcotic addiction and that his job required him to be narcotic-free–denied his claim for disability benefits because it determined his medical condition did not make him unable to perform his job. *Id.* Gaither filed an ERISA appeal, arguing that under the circumstances of his case, Aetna's failure to inquire about the reason Monsanto put him on leave rendered its decision arbitrary and capricious. *Id.* at 795. Aetna defended the ERISA lawsuit on the basis that it did not know, and was under no obligation to find out, why Gaither lost his job. *Id.* at 794. The district court affirmed Aetna's decision, and Gaither appealed. *Id.* at 795.

The court acknowledged that it could not look beyond the administrative record. *Id.* at 801. However, it found the administrative record established that Gaither's difficulty weaning himself from narcotics had required him to be in and out of the hospital, that being drug-free was an essential requirement for his job, and that even after his doctors thought his health was good enough to allow him to return to work, his employer maintained that he was unfit to resume his duties until he was not longer taking any narcotic pain medications. *Id.* at 802. In the face of this evidence, Aetna should have further investigated the extent or effects of his uncontroverted use of painkillers. *Id.* at 806.

In analyzing the insurer's duty to investigate, the court stated:

Aetna complains that it cannot be required to discover and scour every single one of the Company's records that pertain to a particular employee that has

>submitted a claim for benefits. We agree, and we do not announce such a sweeping principle. Nor do we suggest that the administrator must pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or another.
>
>Rather, we assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence on the records suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory.

*Id.* at 807 (quotations and citations omitted). The court went on to describe the appropriate claim investigation process:

>Aetna's position seems to be that as a plan fiduciary, it plays a role like that of a judge in a purely adversarial proceeding, where the parties bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim. ... Aetna has the wrong model. Indeed, one purpose of ERISA was to provide a nonadversarial method of claims settlement. In *Gilbertson v. Allied Signal, Inc.,* we explained what this nonadversarial process should look like:
>
>>[ERISA and its implementing regulations require] a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied ... the reason for the denial must be stated in reasonably clear language, ... [and] *if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.* There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.

*Id.,* citing *Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 635 (10th Cir. 2003) (emphasis added).

Further, the court stated:

>While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own. An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter.

*Id.* at 807-08.

Here, as in *Gaither,* the court finds and concludes that the administrative record contains information which should have caused Hartford to seek additional information. Hartford terminated Galutza's long term disability benefits based on Dr. Sherburn's December 18, 2003, letter. Galutza's appeal letter, accompanied by additional doctors' records and his history**,** made it clear that Galutza believed Dr. Sherburn was mistaken. His appeal letter and History explained that he had been doing yard work because Dr. Marouk had encouraged him to resume normal activities. He had taken pain medication in order to do so, and had been in pain afterward. The appeal letter and History further informed Hartford that Dr. Sherburn would be deposed about the opinions expressed in the letter to the worker's compensation attorney. Hartford had extensive medical records which established that Galutza had already undergone two discectomies and potentially needed additional surgery.

Faced with this knowledge, Hartford could have requested additional information from Galutza or from Dr. Sherburn or advised Galutza to withdraw his appeal until after the doctor's deposition had been taken or the issue of his December 18 opinion had otherwise been resolved. Instead, in what appears (as Galutza puts it) to have been a "rush to judgment," Hartford quickly denied the appeal.[3] In short Hartford, in contravention of the Tenth Circuit's pronouncement in *Gaither*, "shut [its] eyes to readily available information when the evidence in the record suggested that the information might confirm the beneficiary's theory of entitlement." 394 F.3d

---

[3]On March 26, 2004, when Hartford issued its appeal denial, it still had 10 days before expiration of the initial 45-day review period. Further, it had the option to extend the appeal by 45 days and even toll the appeal decision deadline if it had sought more information from Galutza and he had delayed providing the information.

14

at 807. The court finds that under the circumstances, and applying the standard set out in

*Fought,* Hartford's handling of the appeal was arbitrary and capricious.

### B.  Hartford's Notice of Denial of Benefits and Appeal Rights

ERISA requires that an employee benefit plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133. Implementing regulations require the administrator to provide the beneficiary

with a denial notice "set forth in a manner calculated to be understood by the claimant" and

including, in pertinent part:

(i)     The specific reason or reasons for the adverse determination;

(ii)    Reference to the specific plan provisions on which the determination is based;

(iii)   A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)   A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. §2560.503-1(g)(i)-(iv).

Galutza argues Hartford's denial notice did not provide him with adequate notice of the

additional material or information necessary for him to perfect his claim, or explain why such

material was necessary. Hartford contends its notice complied with statutory and regulatory

requirements.

In evaluating this issue, the court must determine whether Hartford's notice substantially complied with the statute and regulations. *See Gilbertson v. Allied Signal, Inc.* (328 F.3d 625, 634-35 (10th Cir. 2003).

Having reviewed the denial notice, the court finds Hartford adequately advised Galutza of the basis for denial–i.e., that Galutza no longer met the policy definition of "disabled," referenced the specific plan provisions upon which the determination was based, and advised him of the plan's review procedures and time limits and his appeal rights under ERISA–as required by 29 C.F.R. §2560.503-1(g)(i), (ii) and (iv).

However, the notice failed to provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," as required by 29 C.F.R. §2560.503-1(g)(iii). Instead, it simply stated: "Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim." (*See* Statement of Facts, ¶14).[4] Therefore, the court finds the notice did not substantially comply with the requirements of 29 U.S.C. §1133 and 29 C.F.R. §2560.503-1(g). This defect in the notice contributed (along with Hartford's actual handling of the appeal) to Galutza being deprived of a "full and fair review" of his claim, as required by 29 U.S.C. §1133.

## IV. Conclusion

The court hereby finds in favor of Galutza and against Hartford on Galutza's appeal of the

---

[4]The court rejects Hartford's assertion that, based on the language of the notice, Galutza "could....clearly see that medical confirmation or certification of a disabling condition was what he needed to perfect his claim." [Doc. No. 57, p. 7]. Galutza, who was unrepresented by counsel at the time, was a truck driver with a high school education–not an insurance expert.

denial of his long term disability claim, and remands the case to Hartford so that Galutza can have a full and fair opportunity to present his claim for benefits.  On remand, Hartford should review the record and request and obtain additional documentation if necessary to determine Galutza's eligibility for disability benefits.

ENTERED this 30th day of March, 2010.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma